1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - -X
 UNITED STATES OF AMERICA,    :   14-CR-00414(BMC)
                              :
                              :
                              :
                              :
       -against-             :   United States Courthouse
                              :   Brooklyn, New York
                              :
                              :
                              :
 RASHAWN SMALLS,             :   Thursday, June 25, 2015
          Defendant.         :   10:00 a.m.
                              :
- - - - - - - - - - - - - - -X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR EVIDENTIARY HEARING
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government:    KELLY T. CURRIE, ESQ.
                       Acting United States Attorney
                       Eastern District of New York
                          271 Cadman Plaza East
                          Brooklyn, New York 11201
                       BY:  ELIZABETH GEDDES, ESQ.
                            MATHEW S. MILLER, ESQ.
                            Assistant United States
                            Attorneys


For the Defendant:     COLSON & HARRIS LLP
                       Attorneys for the Defendant -
                       RASHAWN SMALLS
                          80 Broad Street, 19th Floor
                          New York, New York 10004
                       BY:  DEBORAH A. COLSON, ESQ.
                            KRISTEN M. SANTILLO, ESQ.


Court Reporter:    Lisa Schwam, RPR, CRR, RMR
                   Official Court Reporter
                   Telephone: (718) 613-2268


Proceedings recorded by computerized stenography.  Transcript
produced by Computer-Aided Transcription.

2

1          (In open court.)

2          THE COURTROOM DEPUTY:  United States versus Rashawn

3    Smalls, Docket No. 14-CR 414.

4          Counsel, please state your appearances starting

5    with the government.

6          MS. GEDDES:  Elizabeth Geddes and Mathew Miller

7    for the government.  Also seated at counsel table is Craig

8    O'Connor from the Medical Examiner's Office.  Good morning,

9    your Honor.

10         THE COURT:  Good morning.

11         MS. COLSON:  Good morning, your Honor.  Deborah

12   Colson and Kristen Santillo for Mr. Smalls.  And we have our

13   expert here as well, Dr. Krane.

14         THE COURT:  All right.  Good morning.

15         Okay.  We're here on the defendant's *Daubert*

16   motion to suppress the DNA identification or to preclude

17   expert testimony before the jury based on that.  I have a

18   number of questions, mostly for the government.  The first

19   one is I think pretty basic, and I'm just concerned I'm not

20   seeing something that's very obvious.

21         Both parties seem to think that under the

22   protocols that OCME follows, it's okay to disregard the

23   locus with the greatest number of alleles.  That's in the

24   protocols.  I'm not seeing that anywhere in the protocols.

25   The protocols that I'm seeing say that artifacts have to be

1    taken into account, which strikes me as kind of like the

2    Sentencing Guidelines; like I've got to consider them, but I

3    can then disregard them if I don't like them.

4              Is it that as a matter of practice OCME takes

5    things into account, but then it effectively just disregards

6    the one with the greatest number of alleles?  Is that how it

7    works?

8              MS. GEDDES:  No, Judge.  This is in the protocols

9    and I'll show you where it is.

10             THE COURT:  I thought I might be missing it.  God

11   knows there's enough paperwork so it wouldn't be surprising.

12             MS. GEDDES:  So I'm going to find the precise

13   place, but there's in the protocols, it actually states when

14   you can do FST and it specifies that you can -- you cannot

15   do it if there are seven or more alleles at two loci,

16   suggesting that you can do it when there's seven or more

17   alleles at one loci.

18             THE COURT:  The inference being from that that you

19   will disregard the locus with the greatest number of

20   alleles.  If there's one that stands out higher, that one

21   you can just eliminate.

22             MS. GEDDES:  Not eliminate, but you -- because

23   that extra allele could be the result of drop-in or stutter,

24   then OCME's protocols provide that you can still consider

25   that a three-person sample.  It's when there are two alleles

4

1  with seven or more loci when they don't believe that it's

2  simply a result of drop-in or stutter that you can then

3  account for that extra allele for them.

4          THE COURT:  Okay.  That brings me to my next

5  question, which is I take it it's common ground, OCME also

6  agrees, that you can't use this test if you know you have a

7  four-person or more mixture, right?

8          MS. GEDDES:  It has not yet been validated for

9  that.

10         THE COURT:  Okay.  Everything I'm seeing here

11 suggests to me -- before I get to that, what that means in

12 the real world is that if your witness had said that she

13 took the gun from the defendant and then two guys she didn't

14 know came by and one of them took it from her and passed it

15 to the other guy and they left, you couldn't use FST to

16 determine whether there's DNA corroboration for that story,

17 right?

18         MS. GEDDES:  That's not true.

19         THE COURT:  Okay.

20         MS. GEDDES:  Because not -- just because you touch

21 something does not mean that your DNA is going to attach to

22 that.

23         THE COURT:  Right.

24         MS. GEDDES:  So in the validation studies that

25 they use for FST, they had numerous four-person-touched

5

1    samples.  So they took a pen and they passed it from one

2    person to another person to a third person to a fourth

3    person.  And when they looked at the data, there were only

4    two people's -- and they knew who the four people were --

5    but only two people's DNA would show up on many of them.  On

6    some of them three would and on some of them four would as

7    well.

8              But the reason is that not everyone transfers

9    their DNA onto something that they can touch.  There's a

10   variety of reasons that affect that.

11             THE COURT:  Okay.  But I think that makes the

12   point I was trying to make.

13             If your witness were to testify to the scenario I

14   outlined and there were -- you were only able to find

15   samples of two people, it wouldn't corroborate your

16   witness's testimony.

17             MS. GEDDES:  It doesn't --

18             THE COURT:  It doesn't mean it didn't happen, but

19   it doesn't mean that it did.

20             MS. GEDDES:  That's right, Judge.

21             THE COURT:  Okay.  All right.

22             When I look at what's happening here, it looks to

23   me like the most logical conclusion is that you got four

24   people.  Here's why I'm saying this.  You have seven alleles

25   present at one locus.  Even if you assume that there's three

1    contributors, where does the seventh allele come from?

2         MS. GEDDES:  So the seventh allele can be

3    explained by drop-in.  And drop-in can be either

4    contamination or it can be a very minor contributor.  And

5    when it's just a very minor contributor where you've got

6    like one allele from somebody who is attaching to that, OCME

7    doesn't deem that a four-person sample, it's a three-person

8    sample.  It also can be some of the other stutter effects

9    that are found.

10         And the problem is that -- what I would focus on

11    is the remaining alleles that have far fewer than seven.  In

12    fact, most of them have four or five.  Which is not

13    consistent with a four-person allele -- I'm sorry, a

14    four-person sample.  And OCME has developed these protocols

15    based on their experience and the study that was done by

16    Ms. Perez showing that typically in four-person samples

17    there are seven or more alleles in two loci.

18         THE COURT:  I understand, and you're both relying

19    on the Perez study.  And what you've just done is to give me

20    one possible explanation why there might not be four

21    contributors.  But that doesn't mean there weren't.  It

22    seems to me you have to be able to nail it pretty

23    conclusively down to three contributors in order to use the

24    test when you acknowledge that it's only valid for up to

25    three contributors.

7

1          MS. GEDDES:  It's valid for what the OCME

2    determines as three contributors.

3          THE COURT:  Right.  But it's kind of

4    self-fulfilling, isn't it?  Basically, you've assumed your

5    conclusion by saying that.  You're saying, well, we

6    disregard that seventh allele, it's on outlier, and we're

7    allowed to do it by our protocol because we think that often

8    happens and it's accounted for by drop-in.

9          And, therefore, we conclude -- there's something

10   circular about it, isn't there?

11         MS. GEDDES:  Yes, Judge.  But the difference

12   between the studies cited by the defense and the OCME's

13   protocols are that they do account for drop-in.  And drop-in

14   is a real phenomenon that is accounted for in FST.  And that

15   is why they have developed the protocol such that it's not

16   just one allele.  They look at the entire sample and, based

17   on their experience, they make a determination that it's

18   more likely a three-person sample than a four-person sample.

19         THE COURT:  Okay.  I understand what you're

20   saying.  Let me ask you about this.

21         We've got 69 alleles in the two rungs.  You're

22   telling me that three of those 69 are the result of stutter.

23         MS. GEDDES:  May well be the result of stutter.

24         THE COURT:  Then we have 66 alleles left.  The

25   Perez study says that's four people.

1          MS. GEDDES:  The Perez study was based on a sample

2     of individuals, and it doesn't conclusively say you

3     must -- if you have 66 alleles, then that requires a finding

4     of five person.  It says that in the sample that they -- in

5     the samples that they looked at, that was more likely to be

6     a four-person sample.  But they do identify -- and I want to

7     make sure I'm speaking correctly, but I believe they do

8     identify certain individuals that have 66 -- it was at least

9     65 -- I would like to look -- but which were three-person

10    samples and still had that many alleles.

11         The reality is that a three-person sample could

12    have far more than that because ultimately there could be 90

13    alleles assuming that each of the contributors was

14    heterozygous at each of the loci.

15         THE COURT:  Okay.

16         MS. GEDDES:  So there's no magic number that

17    determines where three-person alleles stop -- three-person

18    contributors stop and four-person contributors start.

19         THE COURT:  I think that's kind of my point.  Like

20    I said, I feel like to get this over the threshold to allow

21    the jury to have it, you need a scientific consensus that in

22    fact there are no more than three contributors.  And instead

23    you've got what I think are, you can call it untested

24    theories, you can call it the exercise of experiential

25    judgment.  And that to me does not just go to the weight of

1    the evidence for the jury to consider and allow

2    cross-examination as to whether there were three or four

3    because we're dealing with invalidity at four.

4         So it's something I think has to be crossed

5    definitively before you get to the jury with it.

6         MS. GEDDES:  Right.  But these protocols have been

7    validated.  I mean, the protocols that identify how you

8    determine a three-person versus a four-person have been

9    validated.  They have been presented to the DNA subcommittee

10   and approved as valid.  They are part of the protocols that

11   are reviewed by the auditors that come in every one year,

12   two years, five years, and they have accepted these

13   protocols as accurate.

14        So this isn't a guess that this is best described

15   as a three-person.  This is an assessment that has been

16   accepted and approved by outside organizations.

17        THE COURT:  Well, that gets me to the broader

18   concern I have with the FST, which is when you're dealing

19   with a scientific testing protocol, it's a different kind of

20   peer review to sit down with a body of peers and say here's

21   what we've done and here's what we found and have all the

22   peers say, well, what you say is logical, it makes sense, we

23   find no fault in it and we, therefore, approve it.

24        That's one kind of peer review.  The other kind of

25   peer review that think is most important, not necessarily

1   required under *Daubert* but most important in the area of

2   scientific testing, is replication; that is, here's our

3   source code, you do it, you test our assumptions, you see if

4   it comes out the same way.

5           And that hasn't been done.

6           MS. GEDDES:  It hasn't been done yet in this case,

7   that's true.

8           THE COURT:  That's a real concern, because it

9   could be done, right?  You could open the source code.

10          MS. GEDDES:  And in fact -- one moment.

11          (Brief pause.)

12          MS. GEDDES:  I'm not sure this is going to assuage

13  you, but the reason why it was not an open-source code is

14  because the city was in the process of making sure the

15  appropriate copyrights were attached to the source code.

16  That has now been done and the source code has been shared

17  with Penn State University as well as Ms. --

18          THE COURT:  So we're in the process of the kind of

19  peer review that could result in replication, but those

20  entities that have been given the source code have not yet

21  published their results.

22          MS. GEDDES:  That's right.  This all happened in

23  the relatively recent past.

24          That said, they are never going to use the precise

25  source code in their own labs because this has been

1    validated and developed based on the equipment at the OCME.

2    And so it can't be replicated precisely, but what has been

3    done and what we believe is sufficient under *Daubert* is they

4    have provided all of the studies that they use to validate

5    it to this subcommittee.  And as your Honor recognized,

6    there's no requirement that this code be open and

7    replicated.

8         THE COURT:  It's not required, but it's certainly

9    helpful.  If I had, you know, three other medical labs that

10   had said we've used the same source code and now we agree

11   having used it in the same manner as OCME, we think it works

12   well, then you've had real tight peer review.

13        MS. GEDDES:  You would have more peer review in

14   that case.  However, the validations have provided ample

15   explanation for what is contained in the source code.  And,

16   frankly, it has allowed the defense expert to identify their

17   concerns with it in a way that it didn't require the source

18   code to do that, but because they were very open about how

19   this worked, they were in a position to bring that open.

20        I don't think it would have made a difference,

21   frankly, if it was open code or not.

22        THE COURT:  Well, we don't know.  I mean, if

23   somebody used the source code and they said this doesn't

24   work, you know, we've tried it and we can't replicate the

25   results that OCME is using, then we have an issue.

1          MS. GEDDES:  That's true, Judge.  But this isn't

2    simply trust me, we did this.

3          THE COURT:  No.

4          MS. GEDDES:  I mean, it was a very, very extensive

5    value indication process that the OCME went through in order

6    to convince the DNA subcommittee that it was appropriate and

7    a valid software, which they then made those binders

8    available not only to the subcommittee but also to the

9    defense so that they could do their own analysis on that.

10         THE COURT:  All right.  Let me get back to the

11   application here.  Another question I've got is I don't

12   think there's any dispute that the sample that was taken

13   from the grip area of the weapon was clearly degraded.

14         If that is degraded, then how is it conservative

15   to say, oh, this is a three-person mixture not a four-person

16   mixture?  We know something else was touched here by

17   something and yet we're still sticking to the conclusion

18   that it was a three-person mixture.

19         MS. GEDDES:  But it was -- it's degraded and that

20   is how you can explain why -- how certain of the loci have

21   no alleles that are shown, right, like D2.

22         THE COURT:  That's one explanation, that it's

23   degraded.  Another explanation is that there's a fourth

24   contributor or fifth or sixth.

25         MS. GEDDES:  But even if there was a contributor,

1    it's such a minor contributor that they don't view it as a

2    four-person or five-person or six-person.  The point is that

3    they have looked at the entire sample and determined based

4    on what's there.  And, frankly, there are a lot of alleles

5    that are shown, right, like not all of them -- it's really,

6    frankly, just D2 that falls out.

7          THE COURT:  Okay.  Then the other question I've

8    got for you, it's more of a systemic question.  This has

9    been a fascinating exercise for me.  I've really enjoyed

10   doing it.

11         I have some difficulty seeing the jury do it.  At

12   the very least, we've got what would be after jury selection

13   a half-day trial without this evidence.  You add this

14   evidence, I think you're talking about a minimum three-day

15   trial, maybe four to five.  And at some point it's not the

16   defendant that's on trial anymore, it's the science.  And

17   that raises some real Rule 403 concerns for me.

18         MS. GEDDES:  Right, Judge.  And look, it may

19   ultimately be that were your Honor to allow us to introduce

20   this testimony, we may ultimately decide not to do that for

21   that reason.

22         THE COURT:  That would be annoying, okay.  After

23   everything I put in to try to understand this very complex

24   matter you were to say never mind.

25         MS. GEDDES:  To you and me both.

1         However, we identified for your Honor early on the

2    reason why we were relying upon this is we didn't know

3    exactly how our case would go in in light of one of the

4    witnesses.

5         That said, we were trying to be very inclusive in

6    the amount of information that we provided to you.  I do not

7    believe the jury would need to get into all of this.  For

8    example, there's no dispute about how likelihood ratios are

9    calculated and the lengthy explanation that Dr. Mitchell

10   goes into on how this was created.  We would not have to go

11   into that much detail to the defense -- or to a jury.

12        THE COURT:  You think you wouldn't.  I think you

13   would.  The reason I think you would is while I think you

14   could present the direct testimony in certainly a less

15   detailed form than you gave it to me, the fact of the matter

16   is that the defendants are going to tear it apart, as they

17   did in their opposition papers, and then you are going to

18   feel obliged to defend it by putting in everything that you

19   told me originally.

20        So I think you will have in front of the jury one

21   way or another everything that I've seen here.  The

22   defendant is going to require it.

23        MS. GEDDES:  That may be true, but then I would

24   really highlight the standard of 403.  This evidence is

25   quite probative and particularly in a case in which

1  depending how the testimony goes in, whether the defendant

2  really touched this gun is going to be critical to it.

3          So we believe that it's very probative and even if

4  it adds an extra day or two, that's not an undue amount of

5  delay.  It's still a relatively short trial.

6          THE COURT:  If it's a day or two, I would tend to

7  agree with you.  I'm not at all sure it will be.  I think

8  I've got affidavits from at least three experts per side,

9  maybe four from one.  And again, to take a jury through

10 this, you've got to have charts and slides, not on your

11 direct, but I think you'll end up doing it on direct because

12 you'll see what's coming on cross.

13         And I really think it's potentially an extra three

14 to four days of trial which, again, is not the end of the

15 world, but then I have the additional concern, as much as I

16 have struggled to understand the science here, is it fair to

17 ask the jury to understand the science here?  It may be

18 asking too much.

19         MS. GEDDES:  Your Honor, I want to point you to a

20 case, if I can find it.

21         I think that juries, frankly, are quite capable,

22 and I also think that it may have been more time-consuming

23 for your Honor in part because you're doing it based on the

24 papers.  I think there is something to be said, and I say

25 this having listened to it myself, there's something to be

said for seeing a visual of it presented to the jury at the same time as listening to someone explain it to you.  I think that, frankly, it's much more digestible than reading an affidavit, flipping back to an exhibit, going back to the affidavit.

So I think actually while you are likely to understand it much more than the average juror, I think they will be also in a different position because they will be listening -- or they will be presented this information in a more digestible fashion than, frankly, I think you were.

THE COURT:  Well, that of course is one of the reasons why we have live testimony at trials and we don't follow the European system of having things determined just on papers.

MS. GEDDES:  And there are cases, and I will find them, but there are cases which have talked about that we shouldn't assume that juries can't digest this type of information.  And yes, it's complicated, but we have a jury system.  We credit the jury system with being able to understand this.  And if you and I who are not scientists can grasp this, I think that there's a fair likelihood that a jury can grasp this as well.

THE COURT:  You know, frankly, I've had civil cases that have presented scientific issues where there have been *Daubert* motions and I've ruled, you know, let the jury

1   determine it and somehow I've been more comfortable doing

2   that just because they were civil cases.  And if the jury

3   didn't get it right, it was just money.

4           I don't know that there's any authority for the

5   proposition that *Daubert* needs to be more rigorously applied

6   as to the government's evidence in a criminal case.  I doubt

7   it.  But I do want to make sure that the jury really can

8   understand if it needs to rely on this information and

9   particularly because it's so important in a case like this,

10  you know, I feel compelled to take extra caution to make

11  sure we just don't leave the jury in the jury room saying,

12  well, I didn't understand any of that gobbledegook, let's

13  flip a coin and we take the DNA or not.  I really am afraid

14  of that situation.

15          And you may be right that I'm just not giving the

16  jury enough credit in being able to sort out the basic

17  points.  And you may also be right that hearing it live

18  makes it less complicated than reviewing the papers and all

19  the exhibits.

20          MS. GEDDES:  And your Honor can also instruct the

21  jury that if they can't comprehend it, that they shouldn't

22  flip a coin.  That's not the way to handle it.

23          THE COURT:  I'm going to write that down because

24  you won't object to a jury instruction if that's the way I

25  end up --

1          MS. GEDDES:  I will not object.  I think, of

2    course, that they shouldn't do that.  They have to be able

3    to digest and understand it if they are going to rely upon

4    it.

5          THE COURT:  All right.  Let me hear from the

6    defendant.  You can comment on any of the questions I've

7    raised or anything else that you want to tell me.

8          I did want to ask you, is there any DNA mixture

9    analysis that you'd be satisfied with?  It sounds like your

10   objections just go to the point that mixture analysis has

11   not reached the level that it can be placed before a jury.

12         MS. COLSON:  It's an evolving field, yes, a

13   relatively new field.  And I haven't studied all of the

14   other software programs out there.  I have focused primarily

15   on the FST.  So I can't say if there may be another software

16   program out there that's more reliable.

17         But it is my understanding, based on the research

18   I've done, that this is a new and evolving field.

19         THE COURT:  Right.  But what would satisfy you?

20   I'm asking you what would satisfy you so that I see a

21   grounds for differentiating what you point to as defects

22   here.

23         MS. COLSON:  Right.  Well -- one moment.

24         (Brief pause.)

25         MS. COLSON:  One of the things that Dr. Krane has

1    just said to me is what makes him most uncomfortable is that

2    the sample is degraded and drop-out has occurred.  So in

3    that situation, it is hard.

4            What I want to discuss is I think the first

5    question you asked the government, which is, can you nail

6    it?  Can you tell me that this is a three-person sample?

7    Because if it's a four-person sample, the FST should not be

8    used.

9            And I think the government has been pretty clear

10   both here in court today, but also in its paperwork and in

11   the affidavit submitted by Dr. O'Connor, that they cannot

12   nail it, they cannot say that this is a three person sample.

13   They don't even describe it that way.  They describe it as

14   at least a three-person sample.  They also say it's most

15   cautious to say that it's a three-person sample.

16           THE COURT:  Well, when you say they haven't nailed

17   it, I think what they would say on the witness stand is that

18   to a reasonable degree of scientific certainty, they believe

19   it to be a three-person sample.

20           MS. COLSON:  I don't think that's what they're

21   saying, no.

22           THE COURT:  Okay.

23           MS. COLSON:  I think that what they have said very

24   clearly in their affidavits is it is most cautious for us to

25   describe it as at least a three-person sample.  And what Dr.

1   Krane has said is, well, how, because there is no commonly

2   accepted scientific method for determining the number of

3   contributors to a sample.  And that, in fact, the two most

4   important criteria in his mind, which are the total number

5   of alleles and the greatest number of alleles at one locus,

6   tell him that this is at least a four-person sample.

7           But the government, because of its FST protocols,

8   is ignoring the two criteria that not Dr. Krane thinks is

9   most important but that even the scientific community and he

10  has cited a paper has been commonly accepted as most

11  important.

12          THE COURT:  Is that the Perez study?

13          MS. COLSON:  No, that's not the Perez study.

14  That's a study that we cited.  The Butler study.

15          THE COURT:  Okay.

16          MS. COLSON:  Your Honor, what's troubling about

17  this is that if the government has no scientific method for

18  determining the number of contributors, Dr. Krane has no

19  scientific method for determining the number of

20  contributors, how is the jury supposed to do it?  If the

21  jury can't do it and they can't say whether it's three or

22  whether it's four, how are they supposed to know whether the

23  FST should even be applied?

24          So I agree with your Honor that unless the

25  government can nail it and say this is only three people,

1   this evidence shouldn't come in because the jury has no way

2   of determining whether it's three or four.  They don't even

3   know how to do that.

4          So that's the first issue.  But the issue of

5   prejudice is quite concerning because we have cited studies

6   in our reply brief that DNA evidence is viewed by most

7   juries in study after study as being qualitatively different

8   from other types of scientific evidence.  That when juries

9   hear that there is DNA evidence, they most commonly accept

10  it without looking under the hood of the car.

11         THE COURT:  Well, I didn't need the studies for

12  that.  I've talked to enough jurors afterwards that, you

13  know, I think it's generally safe to say that DNA in the

14  evidentiary world is a loaded gun, if you'll pardon the

15  expression in this case.  They do take it very seriously.

16  It's the CSI effect, you know.  They look for the DNA.

17         And I understand your point.

18         MS. GEDDES:  But your Honor, if I might respond to

19  just that narrow issue.  That is where we have someone

20  coming in to court and saying there's a one in a billion

21  chance that this was anyone else.  That is not going to be

22  the testimony in this case.  It's going to be quite clear

23  that this is simply it is more likely than not, and the

24  precise standard is cited in our brief, that the evidence

25  can be explained if the prosecution scenario is correct than

22

1   if the defense scenario is correct.  It's not going to be

2   that type of --

3           THE COURT:  No.  But it's still going to be, if I

4   recall, one in 4,550 something, right?

5           MS. GEDDES:  No.  It's approximately 4,000 times

6   more likely that the prosecution scenario is correct, which

7   is that the evidence can be supported by the defendant being

8   a contributor, than that the defense scenario is correct,

9   which is that the defendant was not a contributor.

10          THE COURT:  And can the jury distinguish between

11  one in 4,500, or whatever it is, as opposed to one in a

12  billion?

13          MS. GEDDES:  Yes.

14          THE COURT:  The billion sounds bigger, but what

15  does it mean to be one in 4,190?  What does that mean?

16          MS. GEDDES:  It means that there is strong

17  evidence that the defendant was a contributor.  But at the

18  same point, the defense will be able to introduce, frankly,

19  the validation study which shows that sometimes that's

20  wrong.  Rarely, but sometimes.

21          And that is not what we will be pinning our case

22  on.  It is just additional support for the government's

23  position that the defendant possessed that gun on that day.

24          THE COURT:  But it's more than that.  I mean, we

25  know, in fact, that it is wrong statistically one out of

1    4,190 times at least, right, in terms of probability?

2              MS. GEDDES:  I don't think that's the way to view

3    it.  Not that it's wrong that many times.  It's that it is

4    more likely that the prosecution scenario is correct than

5    the defense scenario.

6              THE COURT:  Okay.  But remember, when single

7    mixture DNA was first validated for -- single mixture.  When

8    single-source DNA was first validated for use in

9    proceedings, the reason it was accepted was because the

10   numbers were astronomical like that.  It was one in a

11   billion.  Maybe it started out lower, it was like one in a

12   hundred million, one in 500 million.

13             We're not talking about numbers anywhere near that

14   here, right?

15             MS. GEDDES:  No.  It's not that type of scenario.

16   But that's why I think that there's not the risk that there

17   is with that type of -- with single-source DNA, which is

18   fairly more accurate, but there's not that risk with the

19   type of testimony that we are proposing to introduce.

20             The other thing to keep in mind is that the CSI

21   effect works both ways, right?  The defense often makes a

22   big deal when we can't put DNA on the gun.

23             THE COURT:  Right.  That's something we're going

24   to have to talk about if I ultimately determine, and I

25   haven't determined anything, but if I ultimately determine

24

1    to exclude this evidence, then we have to talk about what

2    the defense is allowed to say to the jury about the fact

3    that there is no DNA evidence, if anything.  And whether

4    saying anything would then open the door to all this

5    evidence coming in.

6                MS. COLSON:  That's understood, your Honor.

7    That's obviously understood.

8                THE COURT:  I worry about that.

9                MS. COLSON:  And we accept that.

10               THE COURT:  You accept the fact that you couldn't

11   make anything out of the fact that there's no DNA evidence?

12               MS. COLSON:  We accept the fact that if we did

13   make something out of it, that that would likely open the

14   door, yes.

15               THE COURT:  Okay.

16               MS. COLSON:  But what I want to say about this

17   number 4,190 is that it is a large number.  And as a

18   layperson, it sounds like a large number to me.

19               The second problem I have with it is the mere

20   precision of the number; that it's not an estimated 4,000 or

21   an estimated 5,000, but 4,190 somehow implies scientific

22   accuracy.

23               THE COURT:  It would be worse if it was 4190.23785

24   going on.

25               MS. COLSON:  It would.  But I think this is bad

25

1   enough.

2          And third, the government then proposes to bolster

3   this very precise number 4,190 with a qualitative

4   interpretation that this provides very strong support that

5   Mr. Smalls' DNA is included in the mixture.

6          THE COURT:  By qualitative interpretation, you

7   mean an argument.

8          MS. COLSON:  Yes, an argument.  I mean, this is

9   based on their own protocols that they have set up.  When

10  the number is this large, it provides in their minds very

11  strong support.  So they not only want to tell the jury the

12  number, they want to say that this number implies very

13  strong support that his DNA is included.

14         THE COURT:  Aren't you protected to a degree,

15  though, because you can always say to the jury, you know,

16  when you watch CSI on TV and you see DNA evidence admitted,

17  they are talking about one out a billion chances.  This

18  is -- my math doesn't go enough to do it, but it's a tiny

19  fraction of what you usually see DNA being used for.

20         MS. COLSON:  I don't know.  I don't know.  I don't

21  know if that -- what sort of impact that will have on the

22  jury.  This number sounds large enough to me.  It's 4,100

23  times more likely that his DNA is included than it's not.

24  That sounds like a large number to me.

25         But I keep going back to this initial issue which

1   is can they say that it's just three contributors?  And they

2   can't.  And they can't figure out how to come to that

3   determination, Dr. Krane can't figure it out, no scientist

4   can, so how do we leave it up to the jury?

5           And if the jury can't figure out whether it's

6   three or four, then they can't even go on to the next step

7   of determining whether the FST is reliable, whether, you

8   know, this information has a CSI effect or is prejudicial.

9           THE COURT:  Okay.  Well, I understand your point

10  on that.

11          Anything else you need to tell me?

12          MS. COLSON:  Here's another point important, which

13  is that this likelihood ratio of 4,190, as the Court knows,

14  is based on the supposition that there were just three

15  contributors.  So if there were actually four contributors,

16  then the number is meaningless.

17          THE COURT:  I tend to agree that this issue of the

18  three versus the four really permeates most of the analysis.

19  And the question is whether OCME's protocol and its judgment

20  that this is a reliable enough way to do it is something

21  that the jury can test and determine on its own.

22          But I understand your point that the scientists

23  can't say it with any definitiveness.

24          MS. COLSON:  They can't even attach a likelihood

25  or a probability.  That's why they say at least three and

1    this is the most cautious determination.  They can't give a

2    percentage chance or likelihood chance because they just

3    don't know.

4             THE COURT:  Okay.  Anything else, Ms. Geddes?

5             MS. GEDDES:  Yes.  Just briefly I'd like to

6    respond to that.

7             It's not that the government just doesn't know.

8    It's not the government at all; it's the OCME.  The OCME has

9    developed these protocols.  And I just want to point out, as

10   I believe your Honor understands, that the study cited by

11   Dr. Krane was one that was conceptual in nature.  It

12   literally just took the alleles in combination and said what

13   would -- how many alleles are at the most.  It couldn't

14   possibly have more than six because it wasn't in the lab.

15   It had no inclusion of drop-in or stutter in that instance.

16            So I just think that study needs to be put aside

17   because it's not this particular case.  The more appropriate

18   study to look at is the Perez study which does provide

19   support for the protocols that the OCME developed.  And the

20   OCME analysts are trained to make this determination based

21   on their experience with these guidelines in the protocols,

22   and they applied those very protocols in making a

23   determination that this was best characterized as a

24   three-person versus a four-person.

25            THE COURT:  All right.  Last word to the movant.

28

1          MS. COLSON:  I think what's clear from

2    Dr. O'Connor's affidavit and all of the papers the

3    government has submitted is that their conclusion is that

4    it's at least three people, not that it is three people.

5    And that's based on their own protocols.

6          But our issue, and as we've stated this before, is

7    that the protocols are problematic, one, because they

8    discount the two criteria that most scientists would say are

9    the most important which is the total number of alleles and

10   the greatest number of alleles in one locus.  And second,

11   because the criteria that are listed in the protocols are

12   not weighted in any way.  They don't -- they count the

13   number of criteria present -- three out of eight, six out of

14   nine -- but they don't tell you which criteria are more

15   important than the others.  And the two most important

16   criteria are the ones that they discount.

17          THE COURT:  Okay.

18          It's going to take me a little bit to decide this

19   motion.  Give me 30 days.  Obviously, it's something I feel

20   obliged to write on, and I will have something for you

21   before we next meet in 30 days.  And then we'll talk about

22   where we go from there.

23          Melonie, what do we have about 30 days out?

24          THE COURTROOM DEPUTY:  July 28th at 11:30.

25          THE COURT:  How does that grab everybody?

1        MS. COLSON:  Did you say the 28th?

2        THE COURT:  Yes.

3        MS. COLSON:  Okay.

4        MS. GEDDES:  What time?

5        THE COURTROOM DEPUTY:  11:30.

6        MS. GEDDES:  Judge, would you like me to

7   provide -- I can't find it right here, the protocols are on

8   a CD -- but would you like me to provide the place in the

9   protocols where it explains this seven or more alleles at

10  two loci?

11       THE COURT:  Sure.  Just send me a letter.

12       MS. GEDDES:  I will do that.

13       THE COURT:  Okay.  I'm going to exclude time until

14  the 28th based on the pending motion and the fact that it's

15  a complex motion, even if it's not a complex case.

16       Okay.  Thank you all for the excellent work on

17  this.  It's been quite interesting.  I'll try to get you

18  something well in advance of the conference so you can

19  digest it and we'll see where we go from there.

20       (Brief pause.)

21       THE COURT:  Let's go back on the record for just a

22  second.

23       Can we move that to the afternoon of the 28th?

24       MS. GEDDES:  That should be fine.

25       THE COURT:  2:15.

1          MS. COLSON:  Sure.

2          MS. GEDDES:  Thank you.

3          (Time noted:  10:54 a.m.)

4          (Proceedings adjourned.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25